# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Frank M. Peck, | Case No.: 2:17-cv-01620-JAD-MDC |
| Petitioner | |
| v. | **Order Denying Third Amended Petition for Writ of Habeas Corpus** |
| Terry Royal,[1] et al., | [ECF No. 97] |
| Respondents | |

Nevada inmate Frank M. Peck filed a counseled third amended petition for writ of habeas corpus under 28 U.S.C. § 2254,[2] challenging the constitutionality of his 2009 conviction for a 1994 sexual assault, for which he's serving five years to life, consecutive to a sentence in an unrelated case.[3]  He contends that the 12-year delay between the assault and his indictment—caused largely by advances in DNA-testing technology during that time—violated his due-process rights, and the additional 3-year delay between his indictment and trial violated his right to a speedy trial.  Peck also contends that the state court permitted him to waive his right to counsel despite his equivocal request to do so, the court failed to give him adequate time to prepare his defense after he began representing himself on the eve of trial, the victim's testimony identifying Peck by his voice was unduly suggestive, and the State relied on false testimony

---

[1] According to the state corrections department's inmate-locator page, Peck is currently incarcerated at Ely State Prison ("ESP").  *See* NDOC Inmate Search.  Terry Royal is the warden of that facility.  *See Ely State Prison Facility | Nevada Department of Corrections.*  The Court directs the Clerk of Court to substitute Terry Royal for Respondent Brian Williams under Fed. R. Civ. P. 25(d).

[2] ECF No. 97.

[3] ECF Nos. 107-32; 108-15.

1  regarding the DNA technologies that ultimately allowed law enforcement to identify Peck as the

2  assailant.

3       Because Peck has not shown that he was prejudiced by the 12-year delay before he was

4  indicted, and because the additional 3-year delay while he was awaiting trial was largely a

5  product of his own conduct, I deny Ground 1 of Peck's petition.  Because Peck unequivocally,

6  knowingly, and voluntarily waived his right to counsel, I deny Ground 2.  Peck's claims that he

7  was not given time to prepare an adequate defense (Ground 3) and that the State relied on false

8  evidence (Ground 6) are procedurally defaulted.  Peck has not demonstrated prejudice to

9  overcome that default as to Ground 3, and even if he could overcome default for Ground 6, his

10  false-evidence claim is meritless.  So I deny the petition as to those grounds, too.  Finally, even if

11  allowing the victim's testimony about her voice identification of Peck was error, that error was

12  harmless, so I deny Ground 4.  With no grounds remaining,[4] I deny Peck's third-amended

13  petition for habeas corpus and a certificate of appealability, and I deny as moot Peck's motion to

14  renew the petition.

15                              **Background**[5]

16  **A.     Candace Inman was sexually assaulted in August 1994.**

17       On August 9, 1994, an unknown assailant raped Candace Inman in her apartment in

18  Sparks, Nevada.[6]  Her attacker did not use a condom and ejaculated inside her.[7]  The lights were

19

20  _____

21  [4] I previously dismissed Ground 5 as untimely.  ECF No. 128 at 13.

     [5] These facts are taken from the reporter's transcripts of Peck's jury-trial proceedings.  I make no
22  credibility findings or other factual findings regarding the truth or falsity of this summary of the
     evidence.  This summary is merely a backdrop to my consideration of the issues.

23  [6] ECF No. 107-19 at 170, 176–77, 184–204.

     [7] ECF No. 107-20 at 36, 53.

off but ambient light came from outside her apartment.[8]  Inman described her attacker to the police as a 20- to 25-year-old white man who was approximately 5'6" tall and weighed about 150 pounds.[9]  She could not see his hair as he wore a t-shirt on his head, but she saw that his eyebrows, mustache, and eyes were dark.[10]  He wore a pinky ring on his left hand, shorts, and boots.[11]  While he faced her, she felt "something raised," and may have described it to police as a two-inch scar on his left back shoulder blade.[12]

After the rape, her attacker asked her for a cigarette, and Inman asked him, "Why did you do this?  You didn't need to do this.  You know, you could have just talked to me."  Her attacker replied, "You would have never talked to me.  You would have had nothing to do with me."[13]  As soon as the assailant left, Inman called 911, and officers arrived minutes later.[14]  Inman was transported to a hospital where she submitted to a sexual-assault examination.[15]

**B.    Investigators couldn't match the assailant's DNA to a culprit in 1994.**

Emergency physician Richard Dedolph conducted a sexual-assault examination and obtained swabs of Inman's vaginal wall, swabbed microscopic slides, and gave one slide to hospital medical technologist Carole Phillips.[16]  Phillips viewed the motile sperm microscopic

---

[8] ECF Nos. 107-19 at 180–84, 189–91; 170-20 at 58.

[9] ECF No. 107-20 at 15–20.

[10] ECF Nos. 107-19 at 198–99; 107-20 at 19, 34.

[11] ECF No. 170-20 at 29–30, 55–57, 79.

[12] *Id.* at 20–23, 60–65.

[13] *Id.* at 36–37, 40–41.

[14] *Id.* at 42, 45–47.

[15] *Id.* at 49–53.

[16] *Id.* at 174–85.

slide and wrote "No motile sperm seen."[17]  "None seen," does not mean the slide was "negative" for sperm and it is "quite possible" that sperm were present, but Phillips did not see them.[18]

Nurse Diane Hackworth placed Inman's blood sample and sexual-assault evidence kit, including the swabs and slides, into envelopes; the envelopes were sealed; and she gave them to Sparks Police Department (SPD) Officer Peggy Stout.[19]  A gauze swab of Inman's face was taken and placed into the kit because she stated that her assailant licked her face.[20]  Stout placed Inman's sealed blood sample and separate sealed sexual-assault evidence kit into the evidence room at the police station.[21]

SPD detective Samuel Lee Neuharth compiled two or three computer-generated photographic-lineup arrays based on Inman's description of her attacker.[22]  He included some of the area's known sex offenders.[23]  Inman did not identify anyone in the arrays.[24]  Detective Neuharth also drew, based on Inman's description, a composite sketch of the assailant.[25] Neuharth exhausted available leads "through the photo lineups and interviewing some of them and verifying that they were at work during the time that the alleged crime occurred."[26]

---

[17] *Id.* at 117–26.

[18] *Id.* at 128–29, 131, 133.

[19] *Id.* at 138–47, 153–60

[20] *Id.* at 160–63.

[21] *Id.* at 192–93, 199–203, 205–06.

[22] *Id.* at 89–97.

[23] *Id.* at 97–98.

[24] *Id.* at 98–99.

[25] *Id.* at 17.

[26] *Id.* at 101–03.

On August 30, 1994, Washoe County Sheriff's Office (WCSO) crime-laboratory criminalist Maria Fassett prepared a laboratory report for Inman's blood sample and sexual-assault evidence kit.[27]  Fassett did not examine the motile sperm slide; rather, she examined the other slide and, using a 400 X telescope power, discovered three sperm heads.[28]  She found presumptive semen on the Q-tip swabs but she could not definitely determine whether semen was present or not.[29]  A sample of the gauzed swab taken from Inman's face tested negative for a presumptive presence of semen and contained no biological fluid.[30]  She made no referral for DNA testing because, at that time, there was no suspect.[31]

According to Renee Romero, Director of WCSO's Forensic Science Division, which includes the Washoe County Crime Lab (WCCL), the three sperm heads from the vaginal swab "would not indicate that there was enough to do the RFLP DNA-type test" that the WCCL used in 1994.[32]  No tests were conducted through the 1990s on Inman's vaginal sample for DNA comparison, profiling, or blood-grouping analysis.[33]

**C.    Several years after the assault, new DNA-profiling technology leads to the identification of Peck as Inman's assailant.**

In 2000, the WCCL began using polymerase chain reaction (PCR) amplification for DNA profiling.  The PCR technique allows for profiling using smaller samples of DNA than

---

[27] *Id.* at 279–96.

[28] *Id.* at 295–301.

[29] *Id.* at 289–90, 302–03.

[30] *Id.* at 289–92.

[31] *Id.* at 312–13.

[32] ECF No. 170-25 at 65–66.

[33] *Id.* at 69.

previously required for RFLP DNA-type tests.[34]  The WCCL educated investigators about the capability of obtaining DNA profiles from relatively smaller samples using PCR, contacted investigators who had cases involving previously insufficient DNA samples for DNA profiling to see if they wanted the samples analyzed, and encouraged them to review older cases that previously did not afford sufficient samples for DNA profiling.[35]

In 2001, Inman asked SPD officer Greta Woyciehowsky, who inherited the case while Neuharth was on reassignment, to re-examine the case considering new developments in DNA identification methods.[36]  In November of that year, Romero complied with the request by pulling Inman's vaginal swab and microscopic-slide samples from the lab's evidence vault.[37]  Those samples had not been checked out of the vault since Fassett placed them there in 1994.[38]  Using PCR, Romero found two DNA profiles: one female that matched Inman, and one male.[39]  In December of 2001, Romero placed the male DNA profile that she generated from the sperm found in Inman's vaginal wall into local, state, and national DNA databases.[40]  The databases were checked monthly for matches.[41]

In March 2002, the WCCL unrelatedly received Peck's DNA sample for the purpose of generating and entering Peck's DNA profile into local, state, and national databases.[42]

---

[34] *Id.* at 70–71.

[35] *Id.* at 71–72.

[36] ECF No. 170-20 at 218–20.

[37] ECF No. 107-25 at 72–75.

[38] *Id.*

[39] *Id.* at 75–79.

[40] *Id.* at 80.

[41] *Id.* at 81–83.

[42] *Id.* at 27–30.

Developing Peck's DNA profile was not a high priority at the time because it was not known to be connected to any casework.[43]  In April of 2003, the WCCL generated Peck's DNA profile, entered it into the database, and was immediately notified that Peck's DNA matched the profile from Inman's vaginal swab that contained the sperm heads.[44]  Criminalist Jeffrey Riolo confirmed that the routine DNA profile for Peck he had entered into the DNA database matched the DNA profile that Romero had generated and entered from the sperm in Inman's vaginal swabs.[45]  Because Peck's DNA sample was "collected in a form that does not require a chain of custody be associated with that sample," Riolo wrote a report indicating that "a new reference standard needed to be obtained" from Peck "under the chain of custody format" to confirm the match.[46]  The WCCL notified Neuharth about the DNA match to Peck.[47]  In 2004, Neuharth compiled a new computer-generated photographic-lineup array that included Peck's photograph, but Inman did not identify him.[48]

In December of 2004, Woyciehowsky obtained a seizure order from a judge in Washoe County for Peck's buccal swabs and photographs of Peck's back.[49]  SPD evidence custodian Linda Brown photographed "a raised reddened defect" on Peck's back about a centimeter long.[50]  When the seizure was executed Peck was in Nevada but outside of Washoe County.[51]  In

---

[43] *Id.* at 29–30.

[44] *Id.* at 30–35.

[45] *Id.* at 35–37.

[46] *Id.* at 35–37, 83–84.

[47] ECF No. 107-20 at 103–04.

[48] *Id.* at 104–09.

[49] *Id.* at 226–28.

[50] *Id.* at 228–32, 247–57.

[51] *Id.*

1  December of 2005, Woyciehowsky obtained a second seizure order from a judge in Carson City,

2  where Peck was then located, and additional photographs were taken of Peck's bare back.[52]

3  Woyciehowsky did not find a "two-inch scar" on Peck's back.[53]  SPD Officer Steve Fiore

4  participated in the seizures in 2004 and 2005 and determined that Peck was 5'7" to 5'7.5" tall.[54]

5  On both occasions, Brown obtained buccal swabs from Peck for DNA tests, booked them into

6  evidence, and sent them to the WCCL.[55]

7      Romero received Peck's evidentiary buccal swabs in late 2004 and 2005.[56]  In January

8  2005, she "found that the DNA profile from the Frank Peck reference standard matched the

9  sperm fraction DNA profile from the vaginal swab."[57]  In early 2006, she examined Peck's

10  second evidentiary buccal swab and received the same result: it "matched the sperm fraction

11  from the vaginal swab as well as the previous reference sample."[58]  Romero concluded that,

12  based on her analyses of Peck's DNA samples, "he is the source of the DNA of the sperm

13  fraction on the vaginal swab."[59]  Additionally, Romero compared Peck's DNA profile to the

14  profiles obtained from the gauze sample taken of Inman's face and concluded that Peck was the

15  course of the DNA found on that sample, too.[60]

16

17

---

18  [52] *Id.* at 234–35, 256–58.

19  [53] *Id.* at 237.

    [54] *Id.* at 275–76.

20  [55] *Id.* at 258–60.

21  [56] ECF No. 107-25 at 84–93.

    [57] *Id.*

22  [58] *Id.*

23  [59] *Id.* at 93–94.

    [60] *Id.* at 101.

With respect to both the match to the vaginal swabs and gauze sample, Romero opined that the frequency of occurrence in the matching DNA profile was rarer than 1 in 500 billion.[61] Romero explained, "I am not saying that the chance these two samples would match is 1 in X, I'm saying that this is how often this profile occurs."[62]  She explained that "the frequency of no more than 1 in 500 billion samples," "reflect[s] how often I would expect to observe that DNA profile," and that is "the threshold to make the statement that the individual is the source of the DNA profile."[63]  The frequency of encountering Peck's profile within the Caucasian population was "approximately 1 in 759 quadrillion."[64]

**D.      Inman identified Peck after hearing his voice in court.**

In addition to the conversation they had when her assailant asked for a cigarette, Inman told police that her attacker said something to her like, "Don't scream or fight me and I won't hurt you," but, by the time of trial, she did not "completely remember," although she recalled he made "comments" to her when he hit her.[65]  Inman claimed that two weeks before trial she attended a hearing in the case, recognized Peck's distinctive voice, and was convinced that he was her attacker.[66]

---

[61] *Id.* at 93–94, 101–02.

[62] *Id.* at 104.

[63] *Id.* at 108–09, 111.

[64] *Id.* at 111–12.

[65] ECF No. 107-20 at 30–33.

[66] *Id.* at 72–75.

1  **E.      Peck offered an alibi in his defense.**

2          Peck's older sister Sherry Gray testified that Peck lived in Sparks in August of 1994 but

3  stayed at her house in California between August 5 and 25, 1994.[67]  Gray claimed that their

4  father's check register reflected that he bought an airline ticket for Peck to fly to Reno on August

5  25, 1994.[68]  Gray unsuccessfully attempted to obtain verification of the flight from the airline.[69]

6  William Carnahan, a friend of Gray's husband, saw Peck in Reno sometime in August 1994 but

7  he could not verify Peck's whereabouts on August 9th, the date of the assault.[70]  Peck's brother

8  Larry believed that Peck was at Larry's house in Las Vegas from early to mid-August, but he

9  could not swear that Peck was there on August 9th.[71]

10         Peck's ex-wife, Leslie Crouser, testified in rebuttal.[72]  She was still married to him in

11  1994 and they lived in Sparks.[73]  At that time, he was 5' 7" tall, with brown hair, eyebrows, and

12  mustache, and thinner than he appeared at trial.[74]  He smoked cigarettes and wore his father's

13  pinky ring.  She couldn't remember when Peck received the ring, but she believed that he

14  received it after his father died in February 1995.[75]  She never saw Peck wear combat boots with

15  shorts and didn't recall whether he had a scar on his back.[76]

16

17  ─────────────────
   [67] ECF No. 107-25 at 142–45.

18  [68] *Id.*

19  [69] *Id.*
    [70] ECF No. 142-2 at 6–8, 21.

20  [71] *Id.* at 27–33, 39, 46–47, 53–54.

21  [72] *Id.* at 108.
    [73] *Id.* at 109.

22  [74] *Id.* at 109–11.

23  [75] ECF Nos. 107-25 at 126; 142-2 at 111–14.
    [76] ECF No. 142-2 at 122, 128.

1                                    **Legal Standards**

2    **A.    Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)**

3          Federal habeas relief is governed by the Antiterrorism and Effective Death Penalty Act,

4    also known as "AEDPA."  If a state court has adjudicated a habeas corpus claim on its merits, a

5    federal district court may only grant habeas relief with respect to that claim if the state court's

6    adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

7    of, clearly established Federal law, as determined by the Supreme Court of the United States" or

8    "resulted in a decision that was based on an unreasonable determination of the facts in light of

9    the evidence presented in the State court proceeding."[77]  A state court acts contrary to clearly

10   established federal law if it applies a rule contradicting the relevant holdings or reaches a

11   different conclusion on materially indistinguishable facts.[78]  And a state court unreasonably

12   applies clearly established federal law if it engages in an objectively unreasonable application of

13   the correct governing legal rule to the facts at hand.[79]  Section 2254 does not, however, "require

14   state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or

15   "license federal courts to treat the failure to do so as error."[80]  The "objectively unreasonable"

16   standard is difficult to satisfy;[81] "even 'clear error' will not suffice."[82]

17

18   _____

19   [77] 28 U.S.C. § 2254(d).

     [78] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

20   [79] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

21   [80] *White*, 572 U.S. at 424–27.

     [81] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

22   [82] *Wood v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted); *see also Schriro v.

23   Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes
     the state court's determination was incorrect but whether that determination was unreasonable—
     a substantially higher threshold.").

1    Under AEDPA, the bar is high,[83] and federal habeas relief may be granted only if "there

2  is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts

3  with [the Supreme Court's] precedents."[84]  As "a condition for obtaining habeas relief," a

4  petitioner must show that the state-court decision "was so lacking in justification that there was

5  an error well understood and comprehended in existing law beyond any possibility of fairminded

6  disagreement."[85]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state

7  court's decision," habeas relief under Section 2254(d) is precluded.[86]  AEDPA "thus imposes a

8  'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court

9  decisions be given the benefit of the doubt.'"[87]

10    If a federal district court finds that the state court committed an error under § 2254, the

11  district court must then review the claim de novo.[88]  The petitioner bears the burden of proving

12  by a preponderance of the evidence that he is entitled to habeas relief,[89] but state-court factual

13  findings are presumed correct unless rebutted by clear and convincing evidence.[90]

---

[83] As the United States Supreme Court acknowledged in *Harrington v. Richter,* 562 U.S. 86, 102 (2011), "[i]f this standard is difficult to meet, that is because it was meant to be."

[84] *Harrington*, 562 U.S. at 102.

[85] *Id.* at 103.

[86] *Id.* at 101.

[87] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[88] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[89] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[90] 28 U.S.C. § 2254(e)(1).

**B.      Standards for evaluating procedurally defaulted claims**

"Procedural default" refers to the situation in which a petitioner presented a claim to the state courts, but the state courts disposed of the claim on procedural grounds instead of on its merits.[91]  As the Supreme Court explained in *Coleman v. Thompson*, a procedural default prevents the federal court from reviewing a habeas claim unless the petitioner can show good cause plus actual prejudice or a fundamental miscarriage of justice.[92]  To demonstrate cause for a procedural default, the petitioner must be able to "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule.[93]  That external impediment must have prevented the petitioner from raising the claim.[94] The procedural-default doctrine ensures that the state's interest in correcting its own mistakes is respected in all federal habeas cases.[95]

---

[91] *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

[92] *Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986).

[93] *Murray*, 477 U.S. at 488 (emphasis added).

[94] *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

[95] *See Koerner v. Grigas*, 328 F.3d 1039, 1046 (9th Cir. 2003).

1

**Discussion**[96]

2 **A.    Ground 1—Pre-indictment and pretrial delays**

3        Peck alleges that pre-arrest and pretrial delays violated his rights to due process and a

4 speedy trial under the Fifth and Sixth Amendments.[97]

5

6

>        **1.    The 12-year delay between the offense and Peck's indictment did not violate his due-process rights (Ground 1(A)).**

7        Peck contends in the first part of Ground 1 that the 12 years that elapsed between the

8 assault and his indictment prejudiced his case because during that time, the Nevada legislature

9 changed the statute of limitations for rape.  At the time of the offense on August 9, 1994, the

10 statute of limitations for sexual assault was four years from the reporting date.[98]  But in 1997, the

11 Nevada legislature removed that statute of limitations if the victim filed with a law-enforcement

12 officer a written report concerning the sexual assault.[99]  The legislation was enacted to apply "to

13 a person who committed a sexual assault before the effective date of th[e] act if the applicable

14

15

---

16 [96] Peck alleges that the standard of review in 28 U.S.C. § 2254 violates the U.S. Constitution—
specifically the suspension clause, fundamental principles of separation of powers, the ban on
cruel and unusual punishments, and the guarantee of due process.  ECF No. 97 at 11.
17 Respondents oppose these arguments in their answer to the petition.  ECF No. 135 at 6.  Peck
conceded that the Ninth Circuit Court of Appeals has rejected arguments that AEDPA violates
18 the Suspension Clause and separation-of-powers doctrine.  ECF No. 97 at 11 (citing *Crater v.
Galaza*, 491 F.3d 1119 (9th Cir. 2007)).  Rule 2(c) of the Rules Governing Section 2254 Cases
19 requires a federal habeas petition to specify all grounds for relief and "the facts supporting each
ground."  Conclusory allegations unsupported by specific facts may be summarily dismissed.
20 *Mayle v. Felix*, 545 U.S. 644, 649, 655–56 (2005); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).
Peck failed to specify facts or law in the petition to support these allegations.   So I dismiss these
21 arguments with prejudice as conclusory and without merit and deny a certificate of appealability.

22 [97] ECF No. 97 at 11–17.

23 [98] *See Murphy v. State*, 871 P.2d 916, 919 n.7 (Nev. 1994), *overruled on other grounds by State
v. Sixth Jud. Dist. Ct. in & for Cnty. of Humboldt*, 964 P.2d 48 (Nev. 1998).

[99] *See* Nev. Rev. Stat. § 171.083, *as enacted by* Laws 1997, c. 248, § 1, eff. July 1, 1997.

14

statute of limitations has commenced but has not yet expired" on the act's effective date.[100]  As outlined in the background summary, the investigation of Peck's involvement in this case occurred between 2002 and 2006.  On November 8, 2006, the State obtained a grand-jury indictment for one count of sexual assault for the 1994 attack against Inman.[101]

### a.    Standards for evaluating unconstitutional pre-indictment delay

Pre-indictment delay does not implicate the speedy-trial guarantee of the Sixth Amendment, but it might violate the due-process clause of the Fifth Amendment.[102]  The Supreme Court has explained that "the applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges."[103]  But "the statute of limitations does not fully define (defendants') rights with respect to the events occurring prior to indictment"; rather, the due-process clause plays a role in protecting against oppressive delay.[104]

According to the Supreme Court, "proof of prejudice is generally a necessary but not sufficient element of a due process claim," and "the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused" as well as "fundamental conceptions of justice which lie at the base of our civil and political institutions . . . and which define the community's sense of fair play and decency."[105]  The Supreme Court has otherwise

---

[100] *Id.* (historical and statutory notes).

[101] ECF No. 105-7.

[102] *See United States v. Marion*, 404 U.S. 307, 321–324 (1971); *United States v. Lovasco*, 431 U.S. 783, 788–97 (1977).

[103] *Marion*, 404 U.S. at 322 (cleaned up) (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966)).

[104] *See Lovasco*, 431 U.S. at 789 (internal citation omitted).

[105] *Id.* at 789–90 (internal citations omitted).

declined to "determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution."[106]

In *United States v. Lovasco*, the Supreme Court found that prosecution of a defendant after investigative delay did not violate due process even if his "defense might have been somewhat prejudiced by the lapse of time."[107]  The High Court noted with approval that, when prosecutorial delay is "tactical" or made in "reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense," such a delay may violate the due-process clause.[108]

### b.    *Peck has not shown that he was prejudiced by the pre-indictment delay, so he is not entitled to habeas relief on that basis.*

On direct appeal, the Nevada Supreme Court (NSC) determined that Peck failed to show prejudice from the pre-indictment delay or that the State intentionally delayed filing a charge to gain a tactical advantage:

> [P]eck contends that unreasonable governmental delay in arresting and prosecuting him violated his Fifth Amendment and speedy trial rights.  As to the pre-indictment delay, we conclude that he failed to show with adequate specificity any prejudice from the delay or that the State intentionally delayed filing a complaint to gain a tactical advantage. *See Wyman v. State*, 125 Nev. ___, ___, 217 P.3d 572, 577–78 (2009).[109]

I find that the NSC's determination that Peck has failed to establish prejudice is objectively reasonable.  The statute of limitations for Peck's 1994 offense would have expired in 1998, and he contends that the pre-indictment delay caused him prejudice because, in 1997, the

---

[106] *Id.* at 790 (cleaned up).

[107] *Id.* at 796.

[108] *See id.* at 795 n.17.

[109] ECF No. 108-50 at 2–3.

Nevada legislature retroactively abolished the statute of limitations that would have applied to his case.  As the NSC determined on direct appeal, "[b]efore the statute of limitations for a criminal offense expires, a legislature may amend the statute and extend the limitations period without violating the ex post facto clause."[110]

Although Peck may have been prejudiced by the legislative change—he could not have been charged had the four-year statute of limitations in place in 1994 applied—Peck hasn't shown that any such prejudice stemmed from a tactical or reckless delay by law enforcement. Peck also contends that the delay prejudiced him in violation of due process because the passage of 12 years between the crime in 1994 and his indictment in 2006 rendered him unable to obtain evidence establishing his alibi, like documentary evidence of an airline ticket and banking records that were no longer retained and witness testimony specifying dates and locations of his whereabouts due to the erosion of their memories.[111]  But again, Peck fails to discuss the reasons for the delay and thus does not demonstrate that those reasons—which the record suggests are attributable to new DNA-testing capabilities and the prioritization of new cases over unsolved old ones—are at odds with our nation's fundamental notions of justice.

But even if Peck could show that the reasons for delay were tactical, reckless, or unjust, his claims of prejudice are speculative at best.  Peck's sister remembered that Peck and her father were at her house in California between August 5 to August 25, 1994, but she had no way to prove it beyond her testimony.  Peck's two other alibi witnesses claimed that Peck may have been in Las Vegas at the time of the offense, but they had no way to prove it either.  Peck's sister

---

[110] *See Peck v. State*, 367 P.3d 808 at *1 (Nev. 2010) (first citing *Murphy v. State,* 871 P.2d 916, 919 (Nev. 1994), *overruled on other grounds by State v. District Court,* 964 P.2d 48 (Nev. 1998); then citing *State v. Merolla*, 686 P.2d 244, 246 (Nev. 1984)).

[111] ECF No. 97 at 16.

claimed that based on their deceased father's check register, Peck flew from California to Reno on August 25, 1994, and she unsuccessfully attempted to obtain a receipt from the airline to corroborate the flight. Even if those documents were obtained, they would not have established that Peck was not in Sparks on August 9, 1994. Adding to the speculative nature of Peck's alleged prejudice, Peck's ex-wife testified that Peck lived with her in Sparks and he was not absent for an extended time that summer.

Due to Peck's failure to establish nonspeculative evidence demonstrating prejudice because of the State's delay in obtaining the indictment, the NSC was objectively reasonable in its determination that Peck failed to establish with adequate specificity that he was prejudiced by the delay. And because Peck has failed to establish that nonspeculative prejudice resulted from the delay, I need not consider Peck's contention that the NSC unreasonably applied Supreme Court authority with respect to its determination of the delay-based component of a due process violation for pre-indictment delay. So I conclude that Peck has not established his entitlement to a federal writ of habeas corpus in Ground 1(A).

**2.    The delay between Peck's indictment and his trial did not violate his right to a speedy trial (Ground 1(B)).**

**a.    After he waived his right to a speedy trial, Peck's efforts to substitute counsel and disqualify the presiding judge culminated in an approximately 3-year delay.**

*i.    Peck waived his speedy-trial right in 2006 and, on the eve of trial in 2008, he sought appointment of new counsel.*

Following the grand-jury indictment in November 2006, Peck appeared in court on December 15, 2006, and waived his constitutional right to a speedy trial "to the extent that trial is

set reasonably."[112]  Peck's counsel, Kenneth McKenna, requested trial in September 2007.[113]  The state district court noted that "September is quite a ways away," and asked if that was acceptable to Peck.[114]  Peck replied, "Yes, ma'am."[115]  Trial was set for September 17, 2007.[116]  But, on September 5, 2007, the defense moved to continue the trial.[117]  The State objected, but the court granted the motion, reset the trial for March 3, 2008, and noted there would be no further trial continuance.[118]

On February 13, 2008, McKenna filed a motion to withdraw as Peck's counsel.[119]  The motion attached as an exhibit Peck's forthcoming pro se motion seeking withdrawal of counsel and appointment of substitute counsel.[120]  A few days later, the state district court granted the motion to withdraw.[121]  The Washoe County Public Defender's Office (WCPDO) was appointed as counsel and a hearing was set for March 19, 2008, to schedule a new trial date with newly appointed counsel.[122]

---

[112] ECF No. 105-11 at 5–6.

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.* at 6–7.

[117] ECF No. 105-1 at 37.

[118] *Id.*

[119] ECF No. 105-14.

[120] *Id.* at 8–17.  Peck's motion seeking McKenna's withdrawal as counsel was filed on February 25, 2008.  ECF No. 105-17.

[121] ECF No. 105-16 at 4.

[122] ECF Nos. 105-15; 105-16 at 4–5.

1

2

          *ii.*     *Several attorneys withdraw from representing Peck, and Peck moves to recuse the district judge assigned to his trial, pushing his trial date into 2009.*

3        On March 19, 2008, the state district court amended its order appointing the WCPDO to

4  instead appoint the Washoe County Alternate Public Defender's Office (WCAPDO) because the

5  WCPDO believed it had a conflict of interest.[123]  The court set the matter for a hearing on March

6  28, 2008, to reschedule trial.[124]  On that date the court set trial for November 10, 2008.[125]

7        On April 30, 2008, the WCAPDO filed a motion to relieve itself as counsel, claiming that

8  Peck did not have a conflict with the WCPDO.[126]  At a hearing on the motion on May 28, 2008,

9  the state district court deferred its decision and continued the hearing to June 27, 2008, to allow

10  Peck to submit documents relevant to the court's determination of whether the WCPDO had a

11  conflict of interest with him.[127]  The November 2008 trial date did not change.[128]

12        On June 12, 2008, Peck filed a pro se document entitled "Judicial Notice of Potential

13  Conflict with Counsel," claiming he had a conflict of interest with the WCPDO and the

14  WCAPDO.[129]  At the hearing on June 27, 2008, the state district court ruled that the WCPDO

15  had a conflict of interest and was disqualified as counsel, construed Peck's filing as a motion to

16  disqualify the WCAPDO, and denied that motion.[130]  On August 29, 2008, WCAPDO withdrew

17

18

---

19  [123] ECF No. 105-18.

    [124] ECF No. 105-19 at 4–5.

20  [125] ECF No. 105-20 at 3–4.

21  [126] ECF Nos. 105-23; 105-25 at 2–4.

    [127] ECF No. 105-27 at 26–29.

22  [128] *Id.*

23  [129] ECF No. 105-28 at 2.

    [130] ECF No. 105-29 at 8–11.

as Peck's counsel based on a newly discovered conflict of interest.[131]  On September 16, 2008, the WCAPDO filed a Substitution of Counsel notifying the court that it was unable to continue to represent Peck and had transferred Peck's case to Bob Bell.[132]

Meanwhile, on August 11, 2008, Peck filed a pro se motion for recusal of Judge Brent Adams, alleging that Adams had presided over Peck's brother's capital-murder trial for the killing of a police officer and had exhibited implied bias against Peck during the hearing about representation by the WCPDO and the WCAPDO.[133]  Judge Adams promptly denied the allegations.[134]  On August 18, 2008, Peck's case was transferred to Judge Steven Elliott to decide the recusal motion.[135]  On September 12, 2008, Peck filed an objection to Judge Elliott resolving the motion to recuse and requested transfer to a different judge because Judge Elliot took a deposition and issued an order for seizure of evidence in Peck's case.[136]

On November 7, 2008, Judge Elliott held a hearing at which attorney Bruce Lindsay, who received the case from Bob Bell, appeared for Peck.[137]  Lindsay moved to continue the matter "with the stipulation of my client" to November 25, 2008, to afford Lindsay time to review the case and confer with Peck.[138]  Peck was in "absolute[]" agreement with Lindsay's request.[139]  Judge Elliott agreed to that request as it was Peck's desire and stated that he would confer with

---

[131] ECF No. 105-39 at 2.

[132] ECF No. 105-41.

[133] ECF Nos. 105-34; 105-35.

[134] ECF No. 105-37.

[135] ECF No. 105-38.

[136] ECF No. 105-40.

[137] ECF No. 105-42.

[138] *Id.* at 4–5.

[139] *Id.*

1    the Chief Judge concerning Peck's request that a different judge hear the motion to recuse Judge

2    Adams.[140]  On November 10, 2008, Judge Elliott filed an answer denying allegations of bias or

3    prejudice against Peck.[141]

4         On November 24, 2008, the state district court entered an order appointing Lindsay as

5    counsel for Peck.[142]  The next day, Judge Elliott held a hearing on the motion to recuse Judge

6    Adams.[143]  At the hearing, Peck confirmed he had no problem with Judge Elliott deciding the

7    motion to recuse Judge Adams.[144]  During the hearing, Peck testified under oath that he believed

8    the DNA evidence in this case was "contaminated or planted" and that Judge Adams exhibited

9    implied bias when he stated, "what's wrong with the DNA" when former counsel McKenna

10   commented there would need to be some additional testing because it was an old case.[145]  Judge

11   Elliott found that the allegations of bias against Judge Adams were speculative and denied the

12   motion for recusal.[146]

13        On December 2, 2008, the State filed an application for a hearing to set the matter for

14   jury trial.[147]  At that hearing ten days later, the State brought up Peck's previous waiver of

15   speedy trial, and upon no invocation of that right or objection from the defense, the court

16   scheduled a trial-confirmation hearing on April 22, 2009, and trial on May 4, 2009.[148]

17   _____

18   [140] *Id.*

19   [141] ECF No. 105-43.

     [142] ECF No. 105-44.

20   [143] ECF No. 105-45.

21   [144] *Id.* at 4–5.

     [145] *Id.* at 18–22.

22   [146] *Id.* at 41.

23   [147] ECF No. 105-46.

     [148] ECF No.105-47 at 3–4.

1

2

   *iii.*  *With his May 2009 trial date looming, Peck again moves to fire his attorney and seeks to represent himself at trial.*

3    On March 10, 2009, Peck filed a pro se motion for new counsel, complaining that

4 Lindsay failed to file a notice of appeal from the denial of the motion to recuse Judge Adams and

5 request discovery from the WCCL for independent review.[149]  The following day, Peck filed a

6 pro se petition for writ of mandamus with the NSC, requesting an order directing that Judge

7 Adams recuse himself.[150]

8    On March 24, 2009, Peck filed pro se motions for orders for transcripts of the

9 proceedings and for Lindsay to return Peck's documents.[151]  The next day, Peck filed a pro se

10 petition for writ of habeas corpus in the state district court based on pre-accusation and post-

11 accusation delays, violation of constitutional right to a speedy trial, and untimely arraignment.[152]

12 Two days later the state district court issued a written order denying the petition because Peck

13 was represented by counsel and directed that Peck was not permitted to file pro se pleadings.[153]

14 On March 30, 2009, the NSC denied the petition for writ of mandamus that requested an order

15 directing Judge Adams to recuse himself.[154]  On April 2, 2009, the motion for transcripts was

16 rejected as Peck was represented by counsel.[155]

17

18

19

[149] ECF No. 105-48 at 2.

20

[150] ECF No. 105-49.

21

[151] ECF Nos. 105-50; 107-1.

[152] ECF Nos. 107-2 at 2–6; 107-3.

22

[153] ECF No. 107-4.

23

[154] ECF No. 107-5.

[155] ECF No. 107-6.

On April 14, 2009, Peck and Lindsay each filed motions. Lindsay moved for discovery, indicating that the State had agreed to make its entire file available to the defense, including "a CD of the protocol" used by the State experts "regarding the DNA."[156] He also noticed Dr. Llewellyn as an expert DNA witness, requested funds to pay him as an expert, and moved to permit Llewellyn to independently test the DNA evidence.[157] For his part, Peck filed a notice of alibi defense and a pro se motion to reconsider the denial of his ability to file his pretrial petition for writ of habeas corpus "as his own attorney" because he claimed that he unilaterally "removed" Lindsay as counsel.[158]

On April 22, 2009, the state district court held a hearing to confirm trial and Peck alerted the court to his motion to dismiss counsel, previously filed on March 10, 2009.[159] The state district court denied the motion.[160] Peck responded, "He's fired. I'm proceeding pro se."[161] So the court permitted Peck to file in open court a motion to proceed pro se, and it set the matter for a *Faretta* hearing.[162] At the *Faretta* hearing held on May 1, 2009, the court granted Peck's request to represent himself and appointed Lindsay as standby counsel.[163] On May 5, 2009, the trial court held an in-chambers conference at which Peck attended by telephone and requested permission to file a motion to vacate trial so that he could seek discovery of the underlying

---

[156] ECF No.107-7 at 2.

[157] ECF Nos. 107-8; 107-11.

[158] ECF Nos.107-9; 107-10.

[159] ECF Nos. 107-12 at 9; 105-48.

[160] ECF No. 107-12 at 13.

[161] *Id.*

[162] *Id.* at 13–14.

[163] ECF No 107-16 at 60–64.

laboratory records.[164]  The trial court denied the request.[165]  A jury trial was held from May 6–12, 2009.[166]

### b.    Standards for evaluating constitutional pretrial delay

"The Sixth Amendment guarantees that, '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial.'"[167]  The speedy-trial provision of the Sixth Amendment is engaged by "either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge."[168]  In *Barker v. Wingo*, the Supreme Court directed courts to balance four factors when determining whether a defendant's fundamental constitutional right to a speedy trial was violated: (1) whether delay before trial was uncommonly long, (2) whether the government or the defendant is more to blame for that delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether there is prejudice attributable to the delay.[169]  The Supreme Court "regard[s] none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."[170]

---

[164] ECF No. 107-18 at 10.

[165] *Id.* at 11.

[166] ECF Nos. 107-19; 107-33.

[167] *Vermont v. Brillon*, 556 U.S. 81, 89 (2009).

[168] *See Marion*, 404 U.S. at 320 (explaining that the Sixth Amendment right to a speedy trial does not attach until the defendant becomes an "accused.").

[169] *See Doggett v. United States*, 505 U.S. 647, 651–57 (1992) (citing *Barker v. Wingo*, 407 U.S. 514, 530–34 (1972)).

[170] *Barker*, 407 U.S. at 533.

The Supreme Court has explained that "[t]he first of these [four factors] is actually a double enquiry" because, "[t]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition" a defendant "cannot complain that the government has denied him a 'speedy' trial" if it has "prosecuted his case with customary promptness."[171] "Depending on the nature of the charges, the lower courts have generally found post[-]accusation delay presumptively prejudicial at least as it approaches one year."[172]

"[D]elays sought by counsel are ordinarily attributable to the defendants they represent."[173] "[D]elay attributable to the defendant's own acts or to tactical decisions by defense counsel will not bolster defendant's speedy trial argument."[174] On the other hand, "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government."[175] "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the

---

[171] *Doggett*, 505 U.S. at 651–52 (internal citation omitted); *see also Barker*, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.").

[172] *Doggett*, 505 U.S. at 652 n.1 (cleaned up).

[173] *Vermont*, 556 U.S. at 85.

[174] *McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir. 2003); *see, e.g.*, *United States v. Tanh Huu Lam*, 251 F.3d 852, 857–58 (9th Cir. 2001) (holding defendant responsible for defense counsel's requests for continuances as defendant never moved to substitute counsel or dismiss indictment before trial, each continuance was granted according to legitimate needs of competent counsel, and the defendant benefitted from counsel's additional preparation of the case).

[175] *Barker*, 407 U.S. at 531.

1  defendant."[176]  Negligence is "weighed more lightly than a deliberate intent to harm the

2  accused's defense."[177]

3        "Prejudice, of course, should be assessed in the light of the interests of defendants which

4  the speedy trial right was designed to protect."[178]  The Supreme Court has identified three such

5  interests: (1) "to prevent oppressive pretrial incarceration;" (2) "to minimize anxiety and concern

6  of the accused;" and (3) "to limit the possibility that the defense will be impaired."[179]  Courts

7  must focus on prejudice "caused by the delay that triggered the *Barker* inquiry, not simply any

8  prejudice that may have occurred before the trial date but unrelated to the fact of the delay

9  itself."[180]  "If witnesses die or disappear during a delay, the prejudice is obvious.  There is also

10  prejudice if defense witnesses are unable to recall accurately events of the distant past."[181]

11          **c.**      ***The Nevada Supreme Court reasonably determined that Peck's speedy-***
***trial right was not violated because he was responsible for the bulk of***
12                  ***the delay.***

13        On direct appeal, the NSC determined that Peck's pretrial-delay claim lacked merit

14  because the delays were attributable to him:

15        As to the speedy trial claim, we conclude that it similarly lacks
merit. Peck was indicted on November 8, 2006, and shortly
16        thereafter waived his right to a speedy trial.  Trial commenced on
May 6, 2009.  During that period, several defense-related delays
17        occurred, including a five-month continuance, withdrawal of
counsel, Peck's removal of another counsel and motion to
18        represent himself, and a motion to recuse the trial judge.  Based on
the record, we conclude that Peck failed to demonstrate a violation

19  _____

20  [176] *Id.*

[177] *Doggett*, 505 U.S. at 657.

21  [178] *United States v. Gregory*, 322 F.3d 1157, 1163 (9th Cir. 2003) (quoting *Barker*, 407 U.S. at
532).

22  [179] *See Barker*, 407 U.S. at 532.

23  [180] *Id.*

[181] *Id.*

27

1  of his speedy trial rights.  *See Barker v. Wingo*, 407 U.S. 514, 515
2  (1972); NRS 178.556; *Furbay v. State*, 116 Nev. 481, 485, 998
   P.2d 553, 555–56 (2000).[182]

3      The NSC's determination is neither contrary to, nor constitutes an unreasonable

4  application of, clearly established federal law and is not based on an unreasonable determination

5  of fact considering the state-court proceedings.  The NSC was reasonable to consider the claim

6  as the delay of more than three years for a single count of sexual assault with DNA evidence

7  identifying the defendant as the assailant is uncommonly long and therefore triggers a *Barker*

8  analysis.  The NSC appears to have reasonably concluded that the first component of the *Barker*

9  analysis—the three-year delay between indictment and trial—balances in Peck's favor.

10     The NSC was not unreasonable in emphasizing that the second *Barker* factor does not

11  weigh in Peck's favor because the defense was responsible for the pretrial delays.  Defense

12  counsel requested, with Peck's consent, the original trial date in September of 2007.  The defense

13  moved to continue the trial and the motion was granted over the State's objection, and trial was

14  set for March 2008.  McKenna's motion to withdraw as counsel for Peck, in which Peck

15  concurred, accounted for the delay between the March 2008 and November 2008 trial dates to

16  accommodate new defense counsel.  The delay and resulting continuance of the trial to May

17  2009 was caused by the appointment of new counsel (Lindsay) following the WCAPDO's

18  discovery that it had a conflict of interest, and the defense did not object to the final trial delay.

19     The third *Barker* factor weighs also against Peck.  At arraignment, Peck waived his

20  constitutional right to a speedy trial.  However, two months before trial, he raised a speedy-trial

21  claim when he filed a petition for writ of habeas corpus alleging pretrial delay.  Although Peck

22  raised that speedy-trial claim, he thereafter filed a motion to proceed pro se, indicating he would

23

---

[182] ECF No. 108-50 at 2–3.

be ready for trial in 12 months, and he moved to vacate and continue the May 2009 trial date.
Thus, although he asserted his speedy-trial rights, his actions contradicted that assertion. Peck
has also not shown that the delay between 2006 and 2009 caused him any prejudice. So, because
Peck fails to establish that the NSC's determination was objectively unreasonable, he has not
demonstrated entitlement to habeas relief on Ground 1(B).

**B.    Ground 2—Unequivocal waiver of right to counsel**

Peck alleges that he did not unequivocally, knowingly, voluntarily, and intelligently
waive his right to counsel under the Sixth Amendment because he informed the trial court that
although he wanted to fire Lindsey, he still wanted counsel. He claims that he was coerced to
represent himself or proceed to trial "with an ill-prepared appointed attorney."[183]

### 1.    Additional background

As discussed *supra*, at a hearing on April 22, 2009, Peck told the court that he wished to
remove Lindsay as counsel and noted that he previously filed a motion to dismiss counsel on
March 10, 2009.[184] When the state district court denied the motion to dismiss counsel,[185] Peck
responded "He's fired. I'm proceeding pro se."[186] The state district court permitted Peck to file
in open court a motion to proceed pro se, and it set the matter for a *Faretta* hearing.[187]

Peck's pro se motion, entitled "Motion to Proceed Pro se and Request for Basic Tools
Integral for Effective Defense," cited *Faretta*, stated that Peck "is competent to represent himself
up to and including trial," stated that Peck believed it was in his "best interest" to represent

---

[183] ECF No. 97 at 17–20.

[184] ECF Nos. 107-12 at 9; 105-48.

[185] ECF No. 107-12 at 13.

[186] *Id.*

[187] *Id.* at 13–14.

himself, and asserted that denial of the motion would deny his constitutional right to represent himself and his rights to due process and a fair trial.[188]

At the *Faretta* hearing about two weeks later,[189] Peck confirmed that he held a high-school diploma and certificate from the Nevada Gaming Institute of Technology.[190]  He was previously employed in home-appliance repair and sales.[191]  He was then incarcerated on two prior convictions for sexual assault after a jury trial.[192]  In the prior case, he was represented by counsel at trial and postconviction proceedings and also represented himself in postconviction proceedings.[193]  He was in good health and had no history of mental-health counseling or treatment.[194]  He was not threatened or coerced to waive his right to an attorney.[195]  He understood that he had the right to counsel at no cost to him if he was unable to pay a lawyer.[196]

When the court inquired why Peck requested to forgo counsel and represent himself in this case, Peck replied, "I would prefer to have counsel in this case but your Honor has denied [m]y motion for new counsel."[197]  He stated that he preferred to have counsel in all matters but "in this case I feel that I'll be better served representing myself" "because Mr. Lindsay has done nothing."[198]  Peck also said that he wished to represent himself "because I feel like I could do a

---

[188] ECF No. 107-13.

[189] ECF No. 107-16.

[190] *Id.* at 4.

[191] *Id.* at 4–6.

[192] *Id.* at 6–7.

[193] *Id.* at 7–12.

[194] *Id.* at 57.

[195] *Id.* at 57–58.

[196] *Id.*

[197] *Id.* at 13.

[198] *Id.* at 14.

better job, bottom line."[199]  Peck argued that Lindsay (1) failed to keep his promise to consult an out-of-state DNA expert and instead consulted a local expert; (2) did not respond to 12 letters from Peck; (3) did not ask for the alibi witnesses or documentary evidence supporting Peck's alibi defense; (4) did not obtain statements from various State witnesses; and (5) failed to file a notice of appeal from the denial of the motion to recuse Judge Adams.[200]  When asked why he thought that he could do a better job, Peck replied, "Well, I've been studying the law for 10 years now and Mr. Lindsay has—his actions are reprehensible.  I've never had such a bad experience with an attorney."[201]

Peck confirmed that he understood his rights to a jury trial and to call and examine witnesses at trial, that the State was obligated to prove the charge in the indictment beyond a reasonable doubt, and that he could appeal if found guilty.[202]  He understood that the charge was sexual assault, knew the elements of that offense, and was aware that the maximum possible penalty if convicted was "five to life."[203]  He was aware of defenses such as alibi, the State's failure to prove the elements of the offense beyond a reasonable doubt, and defenses concerning the accuracy of the DNA results.[204]  Peck was aware of the possible witnesses for trial including his three alibi witnesses, Fassett, Romero, Fye (Woyciehowsky), Inman, and others.[205]

---

[199] *Id.*

[200] *Id.* at 18–22.

[201] *Id.* at 15.

[202] *Id.* at 32.

[203] *Id.* at 32–33, 36.

[204] *Id.* at 58–59.

[205] *Id.* at 33–36.

1    The court told Peck how unwise, imprudent, irrational, and risky it is to represent

2  oneself.[206]  The court explained that, in its experience, it did not go well for defendants who

3  represented themselves.[207]  The court stated, if Peck were his brother, he would tell him not to

4  represent himself.[208]  The court explained that if Peck represented himself, then "as a matter of

5  law you never after that have a claim for competence of counsel."[209]

6    Peck confirmed that he understood the considerations set forth in Nevada Supreme Court

7  Rule 253, which the court acknowledged "doesn't apply directly to this proceeding but the

8  considerations in that rule are derived from case law about self-representation."  He confirmed

9  his understanding that he would be responsible for following the same processes and procedural

10  rules as lawyers and cannot expect help from the judge in complying with those rules.  The court

11  also emphasized that Peck would be up against an experienced prosecutor who had tried several

12  long and difficult cases involving complicated scientific evidence.  Peck was also admonished

13  that somebody such as he who is unfamiliar with legal procedures may allow the prosecutor an

14  advantage, may not make effective use of his legal rights, and may make tactical decisions that

15  cause unintended consequences.  He was also told that the effectiveness of the defense may well

16  be diminished by his dual role as attorney in the case.[210]

17    The court explained that it was not obligated to appoint advisory or assistant counsel or

18  reorganize the timing of events in the case to accommodate Peck.[211]  Peck understood that the

19

---

20  [206] *Id.* at 37–38.

21  [207] *Id.*

   [208] *Id.*

22  [209] *Id.*

23  [210] *Id.* at 49–55.

   [211] *Id.* at 38.

court may, but was not obligated to, appoint standby counsel who, in the event that the court
terminates self-representation, would become appointed counsel and represent him for the
remainder of the proceedings.[212]  He understood that if appointed, standby counsel is not
required to advise or provide him with legal advice and is not acting as his lawyer.[213]  He
understood that he could never claim standby counsel did not adequately represent him if he
represented himself.[214]

When the Court explained that Peck was not entitled to special library privileges, Peck
said he understood that, but asked, "what about normal library privileges?"[215]  The court
responded, "You'll be entitled to the privileges of using legal materials wherever you're
incarcerated, the Washoe County Jail or Nevada State Prison or any other facility."[216]  Peck then
stated, "the only place that supplies any legal materials would be Nevada prison," and the court
responded, "You'll have to be confined in the Washoe County Jail during the trial."[217]  The court
explained that, "[i]f it's determined by the Court that there's information necessary for you to
have during the trial, then the Court will make that available to you."[218]  Peck asked, "May I
speak with Mr. Lindsay?  May I have an opportunity before this decision is rendered?"[219]  The
state district court replied, "I thought you made your decision, Mr. Peck. That's why we've been
spending an hour on this subject."  Peck replied, "Yes, I know.  I would like a chance to speak to

---

[212] *Id.* at 59.

[213] *Id.* at 59–60.

[214] *Id.*

[215] *Id.* at 51–52.

[216] *Id.*

[217] *Id.*

[218] *Id.* at 53.

[219] *Id.*

him."[220]   After a brief recess for Peck to speak with Lindsey, the court asked Peck "Anything

further?" and Peck responded, "No, sir."[221]

The state district court told Peck that the "decision about representing yourself is your

own to make subject to the Court's determination on these timeliness and voluntariness

issues."[222]   The court admonished Peck "to think about this very carefully," and stated, "if you

decide to make that decision, then I will decide whether or not it's appropriate to entertain."[223]

Peck replied, "This has dominated my thoughts for months now.  It's all I've been able to think

about.  If Mr. Lindsay would work with me I would love to have him, but I cannot trust him

because he doesn't do what he says he will do."[224]   The Court reiterated, "when all is said and

done, you are the person who decides, subject to the Court's approval, if you want to represent

yourself," and Peck replied, "I have."[225]   The court asked if there was anything else Peck wanted

to tell the court on the subject and Peck stated, "No.  I have to represent myself."[226]

Although the court expressed concern that Peck's interest in representing himself on the

eve of trial was motivated in part by an intent to "derail the legal proceedings or delay or defeat

the legal process," it ultimately concluded that Peck was competent to represent himself.  The

court noted that Peck "seems to be a very intelligent person," had knowledge of the law, and had

"conducted extensive research on the subject of DNA identification, even exceeding that of his

---

[220] *Id.*

[221] *Id.*

[222] *Id.* at 39.

[223] *Id.*

[224] *Id.*

[225] *Id.* at 40.

[226] *Id.*

own counsel." The court also found that Peck understood the risks of self-representation and that he freely, voluntarily, and knowingly waived his right to counsel. The court thus granted Peck's motion to represent himself, appointed Lindsay as advisory counsel, and set trial to begin on May 13, 2009.[227]

During jury selection, the trial court explained that Peck was representing himself and was advised by Lindsay.[228] Lindsay assisted Peck throughout the jury selection.[229] The State expressed concern about Peck's waiver of his constitutional right to counsel and to represent himself because he was "kind of doing a myriad of both."[230] The trial court clarified that Peck was self-represented, Lindsay was advisory counsel, and "whether and to what extent" Lindsay participated in the trial on Peck's behalf was "up to" Peck.[231]

At trial, Peck delivered an opening statement.[232] Lindsay made objections, conducted direct and cross-examination of witnesses, made stipulations, presented argument regarding the jury instructions, and consulted with Peck.[233] Lindsay and Peck each conducted examination of witness Romero.[234] Peck conducted direct examination of his ex-wife and his brother.[235] Peck expressed a desire that Lindsay present closing argument and Peck present a statement to the

---

[227] *Id.* at 60–64. Although the state district court stated that trial would start on May 13th, trial started on May 6th. The State earlier stated it could not proceed with trial the week of May 11th and Peck did not object to the failure to start trial on May 13th.

[228] ECF No. 107-19 at 33.

[229] *Id.* at 3, 33–34, 84, 94–110, 116–17, 120, 123–27.

[230] *Id.* at 121–22.

[231] *Id.* at 122–23.

[232] *Id.* at 164.

[233] ECF Nos. 107-20; 107-25; 107-33; 142-2.

[234] ECF Nos. 107-25; 142-2.

[235] ECF No. 142-2 at 26, 55.

1     jury.[236]  The trial judge explained that Peck was permitted to present argument, but not offer his

2     testimony.[237]  The court offered to hear the statement in advance to assess whether it was

3     permitted, and Peck replied, "I'll just let Mr. Lindsay close."[238]  The trial court offered more time

4     to make the decision and explained the parameters of what was permitted given that Peck had

5     elected to invoke the privilege against self-incrimination, and Peck confirmed that Lindsay

6     would deliver closing argument.[239]

7         **2.**       ***Standards for evaluating constitutional waiver of counsel***

8         The Sixth Amendment guarantees that in all criminal prosecutions a defendant shall have

9     the right to the assistance of counsel for his defense.[240]  The Sixth Amendment also guarantees a

10    defendant the right to refuse the assistance of counsel and to represent himself in criminal

11    proceedings.[241]  To invoke the right to self-representation, a defendant must "knowingly and

12    intelligently" waive his right to counsel in a clear and unequivocal manner.[242]  The Supreme

13    Court has not prescribed any formula or script to be read to a defendant who states that he elects

14    to proceed without counsel.  "[A] waiver of counsel [is] intelligent when the defendant 'knows

15

16

---

17    [236] ECF No. 107-33 at 4–5.

18    [237] *Id.*

      [238] *Id.*

19    [239] *Id.* at 6.

20    [240] *See* U.S. Const. amend. VI.

      [241] *See Faretta v. California*, 422 U.S. 806, 819–20, 832, 834 (1975).

21

22    [242] *Id.* at 835–36 (explaining that, in that case, the defendant was entitled to represent himself as he was "literate, competent, and understanding"; "unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel"; "was voluntarily exercising his

23    informed free will"; and was warned by the trial judge that "he thought it was a mistake not to accept the assistance of counsel and that Faretta would be required to follow all the 'ground rules' of trial procedure").

what he is doing and his choice is made with eyes open.'"[243]  The Ninth Circuit has held that
*Faretta* requires a defendant's request for self-representation be unequivocal, timely, and not for
purposes of delay.[244]  The requirement of an unequivocal waiver forces the defendant "to make
an explicit choice."[245]  "If he equivocates, he is presumed to have requested the assistance of
counsel."[246]  "[A] clear preference for receiving new counsel over representing oneself does not
conclusively render a request equivocal under *Faretta*."[247]  "It may, however, be an indication
that the request, in light of the record as a whole, is equivocal.[248]

> ### 3.    *Peck unequivocally invoked his right to self-representation, so he is not entitled to relief on Ground 2.*

On direct appeal, the NSC determined that Peck's equivocal-waiver claim lacked merit:

> Peck complains that his waiver of his right to counsel under
> *Faretta v. California*, 422 U.S. 806 (1975), was not unequivocal as
> he was compelled to forgo that right due to his strained
> relationship with counsel.  The record shows, however, that the
> district court conducted a commendably thorough canvass,
> including exploring the nature of Peck's displeasure with counsel,
> and appointed counsel to advise Peck during trial.  *See O'Neill v.
> State*, 123 Nev. 9, 17, 153 P.3d 38, 43–44 (2007); *Graves v. State*,
> 112 Nev. 118, 124, 912 P.3d 234, 237–38 (1996).  Moreover,
> despite Peck's displeasure with counsel, he allowed stand-by

---

[243] *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).

[244] *See Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007).

[245] *Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989).

[246] *Id. See, e.g., id.* at 1445 (ruling that "[the defendant] made his preference clear from the start:
He wanted to represent himself if the only alternative was representation by [existing counsel]
. . . . While his requests no doubt were *conditional*, they were not equivocal.").

[247] *Stenson*, 504 F.3d at 882–884 (holding that the state court's determination that *Faretta*
request during trial was equivocal was not "based on an unreasonable determination of the facts"
considering the record as a whole, which included several statements that petitioner "really did
not want to represent himself but that he felt the court and his existing counsel were forcing him
to do so.").

[248] *Id.* (citing *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) (denying request
for self-representation based on defendant's indication that he wanted "advisory" counsel)).

1    counsel to examine most of the witnesses and present opening
     statement and closing argument.  Therefore, we conclude that this
2    claim lacks merit.[249]

3        The NSC's determination incorrectly states that Peck allowed standby counsel to present

4    the opening statement because there is clear and convincing evidence in the state court record

5    that Peck in fact presented the opening statement.  Nonetheless, the NSC's determination was not

6    based on that unreasonable fact determination, as its determination was alternatively based on

7    Peck permitting standby counsel to examine witnesses and present closing remarks to the jury.

8    Accordingly, de novo review is not warranted on that basis.

9        I find that the NSC's determination that Peck's waiver of counsel and invocation of his

10   right to self-representation was unequivocal, knowing, voluntary, and intelligent constitutes an

11   objectively reasonable determination based on the record.  The trial court conducted an extensive

12   canvass of Peck's background, understanding of the case, reasons for choosing self-

13   representation, and whether he understood the dangers and disadvantages of self-representation.

14   Although Peck at times expressed that his request for self-representation was conditional

15   because, among other things, the court would not dismiss Lindsay as counsel, Peck nonetheless

16   repeatedly affirmed that he wished to represent himself.  When given an opportunity to confer

17   with Lindsay and change his mind about his request, Peck confirmed that he wished to represent

18   himself.  It was thus not unreasonable to conclude that Peck's choice was "made with eyes

19   open."

20       Peck claims that Lindsey's ineffective assistance leading up to trial forced him to

21   represent himself, rendering his waiver equivocal.  But Peck has not established that Lindsay's

22

23

_____
[249] ECF No. 108-50 at 4.

pretrial performance was ineffective.[250]  Peck's reliance on *United States v. Mendez-Sanchez*[251]

is unpersuasive.  In that case, the court denied substitute counsel and defendant stated he wished

to go to trial, "but not with [these] lawyers."[252]  The trial court asked if the defendant wished to

represent himself and the defendant stated, "that would be better."[253]  Several minutes later,

however, the defendant stated, "I think [it] would be better if a lawyer will help me.  But I hope

that it would be a good lawyer, not like these guys."[254]  Under those circumstances, the Ninth

Circuit held that the trial court did not clearly err in determining the waiver of counsel was

equivocal.  The Ninth Circuit acknowledged that "[a] conditional waiver can be stated

unequivocally, as for example when a defendant says in substance: 'If I do not get new counsel, I

want to represent myself.'  There is a *condition*, but the demand is unequivocal."[255]

Unlike Mendez-Sanchez, Peck did not equivocate whether he wished to proceed with

counsel.  Peck repeatedly demanded self-representation.  He brought a motion to proceed pro se

to the trial-setting hearing even though the court had not yet denied his earlier filed motion to

dismiss counsel.  He stated in his motion to proceed pro se that he believed it was in his best

interest to represent himself.  His motion stated that the "request and the timeline is contingent

---

[250] *See, e.g.*, *Cook v. Schriro*, 538 F.3d 1000, 1016 (9th Cir. 2008) (ruling that the state court's finding that defendant's waiver of right to counsel was knowing, intelligent, and voluntary was not contrary to or unreasonable application of clearly established federal law, and did not warrant federal habeas relief, given defendant's failure to show that he was forced by trial counsel's ineffectiveness to choose self-representation as he failed to show counsel was ineffective and given trial court's probing and thorough colloquy before finding a valid waiver).

[251] *United States v. Mendez-Sanchez*, 563 F.3d 935 (9th Cir. 2009).

[252] *Id.* at 946.

[253] *Id.*

[254] *Id.*

[255] *Id.*

1    on Mr. Peck having unrestricted access to work day and night."[256]  But at that hearing he

2    unequivocally stated that he had fired Lindsay and was proceeding pro se.  He then had two

3    weeks to think about it before the trial court granted his wish at the *Faretta* hearing.  During the

4    *Faretta* canvas, he told the trial court that he had been considering self-representation for months

5    and concluded that he was better off representing himself rather than proceeding with Lindsay.

6    When the trial court explained, "when all is said and done, you are the person who decides,

7    subject to the Court's approval, if you want to represent yourself," Peck replied, "I have."  The

8    court then asked if there was anything else Peck wanted to tell the court on the subject and Peck

9    stated, "No. I have to represent myself."

10            Peck and the court discussed his access to library materials were he to represent himself,

11   but there was no indication that his request to self-represent was conditioned upon receiving

12   greater access to legal materials than he was already afforded in jail.  The court gave Peck a

13   recess and an opportunity to change his mind before a final decision was made, but Peck decided

14   to represent himself.  Lindsay and Peck worked together on the case over the weekend before

15   trial, and Peck delegated the lion's share of the trial work to Lindsay, while Peck presented his

16   theory of his case in opening statements and through his examination of DNA expert Romero

17   and his alibi witnesses.  Under these circumstances, it is objectively reasonable to conclude that,

18   based on the entirety of the record, Peck's waiver of counsel and election to proceed pro se was

19   unequivocal.

20            I thus find that the NSC's determinations were neither contrary to, nor constitute an

21   unreasonable application of, clearly established federal law as determined by the Supreme Court

22

23

---

[256] *Id.*

and are not based on an unreasonable determination of fact considering the evidence presented during the state-court proceedings. Peck is not entitled to federal habeas relief for Ground 2.

**C.    Ground 3—Denial of adequate time to prepare a defense**

In Ground 3, Peck claims that the trial court violated his right to due process when it denied him adequate time to prepare his defense.[257] I previously deferred a determination of whether this claim is procedurally defaulted until adjudication of the merits of the petition.[258] Respondents contend that Peck fails to overcome the default.[259]

*1.    Additional background*

At the hearing on the WCAPDO's motion to withdraw as counsel in May 2008, the state district court informed Peck that "[i]n the unlikely event the Court decides to substitute counsel your trial date will not change. It will go forward in November, period."[260]

At the April 22, 2009, hearing on the motion to dismiss counsel, Peck confirmed that he understood the trial would not be continued if he were to represent himself:

> THE DEFENDANT: Then I'd like to file this motion to proceed pro se in open court.
>
> THE COURT: You may do so. And we'll set that matter for a hearing. I'd like to do that as soon as possible because if Mr. Peck is going to represent himself and, of course, Mr. Lindsay would be discharged and we don't have long to prepare for trial, Mr. Peck, I will tell you now there will be no continuance of the trial. Do you understand that?
>
> THE DEFENDANT: Sure.
>
> THE COURT: Okay.

---

[257] ECF No. 97 at 20–23.

[258] ECF No. 128 at 13.

[259] ECF No. 135 at 13.

[260] ECF No. 105-27 at 29.

1
2

> THE DEFENDANT: So you'll give me no opportunity to prepare
> or research or anything.
>
> THE COURT: You've been represented, in my view, by very, very
> competent counsel throughout this proceeding and the case has
> been set for trial and we'll proceed to trial, Mr. Peck.[261]

3
4
5

At the hearing, Peck was permitted to file in open court a motion to proceed pro se.[262]

6

The motion requested funds "to purchase a basic laptop computer, printer with software

7

including internet explorer and email address as well as normal telephone access for

8

communications with investigator, research assistant, witness', experts, and consultants."[263]   The

9

motion stated that his "request and timeline were contingent on his having unrestricted access to

10

work day and night."[264]   The motion also stated that "Mr. Peck is confident that he can be ready

11

for trial in as little as 12 months."[265]

12

At the *Faretta* hearing about two weeks later, before the trial court made its ruling on

13

Peck's motion to represent himself, it reminded Peck that trial would not be continued.[266]   The

14

trial court also told Peck that it "certainly has no obligation to reorganize the timing of events in

15

the case to accommodate you."[267]   The trial court, however, asked the State whether witnesses

16
17
18
19

---

20

[261] ECF No. 107-12 at 14.

[262] ECF Nos. 107-12 at 13–14; 107-13.

21

[263] ECF No. 107-13 at 4–5.

[264] *Id.*

22

[265] *Id.*

23

[266] ECF No. 107-16 at 36.

[267] *Id.* at 38.

would be available if trial started a week later.[268]  Some of the State's witnesses were unavailable during the week of the 11th but the State could start trial on the 6th.[269]

On Tuesday, May 5, 2009, the trial court held an in-chambers conference that Peck attended by telephone.  Peck requested permission to file a motion to vacate trial so he could seek discovery of the underlying laboratory records.[270]  The trial court denied the request stating, "As I confirmed when we were in court the last time, the trial will proceed tomorrow.  The motion's denied."[271]  Peck's trial commenced the next day, lasting from Wednesday, May 6 through Tuesday, May 12, 2009, which included a weekend when court was closed.[272]

In the middle of trial, Peck filed a pro se motion stating, among other things, that he was deprived of any legal or research materials before, during, and after trial.[273]  After trial, Peck filed motions indicating that some of his research and legal materials were transported from his prison cell to the detention center, but they arrived disorganized and incomplete.[274]

In his direct appeal, Peck raised no claims concerning his request for trial continuance.[275]  However, in his operative state postconviction petition, Peck raised a claim that he was unconstitutionally denied a continuance to prepare his defense.[276]  Following argument at a hearing, the state district court dismissed the claim, finding that Peck failed to raise it on appeal

---

[268] *Id.* at 49.

[269] *Id.*

[270] ECF No. 107-18 at 10.

[271] *Id.* at 11.

[272] ECF Nos. 107-19; 107-33.

[273] ECF No. 107-37 at 4.

[274] ECF Nos. 107-37 at 4; 107-42 at 2; 108-1 at 2.

[275] ECF Nos. 108-39 at 4–5.

[276] ECF Nos. 111-36 at 9; 111-37 at 25.

1    and failed to request a continuance.[277]  Peck filed a motion for reconsideration but did not raise a

2    claim that the state district court erroneously concluded that he'd failed to request a trial

3    continuance.[278]

4          Peck appealed the denial of his amended state habeas petition.[279]  In his appeal, he

5    claimed that the court's assertion that Peck never asked for more time to prepare is belied by the

6    record and the pleadings.[280]  Following the denial of his appeal from the dismissal of the petition,

7    Peck moved for rehearing, contending that the NSC's determination was belied by the record.[281]

8    The motion for rehearing was denied.[282]  Peck also moved for *en banc* reconsideration,

9    explaining that the record establishes conclusively that he motioned the court for a continuance

10   to seek discovery, subpoena witnesses, and prepare for trial.[283]  The motion for *en banc*

11   reconsideration was denied.[284]

12         **2.**      ***Peck has not shown prejudice to overcome the procedural default of Ground 3.***

13         In postconviction proceedings the NSC rejected the claim:

14           [P]eck raises several claims that could have been raised on direct
             appeal and are thus procedurally barred absent a showing of good
15           cause and prejudice, which he has not made.  *See* NRS
             34.810(1)(b)(2); NRS 34.810(3).
16           . . .
             Peck next argues . . . that the trial court deprived him of sufficient
17           time to prepare his defense, impaired his ability to participate in his
             own defense, and should have appointed substitute counsel.  Peck

18

---

19   [277] ECF No. 114-30 at 9.

     [278] ECF No. 114-33.

20   [279] ECF No. 114-44.

21   [280] ECF No. 115-4 at 15.

     [281] ECF No. 115-22 at 3–4.

22   [282] ECF No. 115-23.

23   [283] ECF No. 115-24 at 3.

     [284] ECF No. 115-25.

has failed to justify excusing the procedural bar because he never moved for a continuance when proceeding pro se and stated his intent to proceed pro se when the trial court considered his motion for substitute counsel.[285]

The NSC's ruling that the claim is procedurally defaulted because Peck failed to raise the claim on direct appeal is objectively reasonable.[286]  Nothing in the state-court record for the direct appeal shows that Peck raised a claim concerning the denial of his requests for trial continuance.  Although Peck raised this claim in his state postconviction proceedings, the NSC determined that he failed to justify excusing the procedural bar as he never moved for continuance when proceeding pro se.  That determination is based on an unreasonable determination of fact.[287]

Peck's motion to proceed pro se stated that if he were to proceed pro se, he could be ready for trial in 12 months.  That request was clearly and convincingly denied at the *Faretta* hearing when the trial court stated, even before ruling on whether Peck could proceed pro se, that the trial would start as planned and the court was under no obligation to accommodate Peck's schedule.  After he was granted pro se status and during the telephonic conference in chambers the day before trial, Peck requested permission to file a motion to vacate the trial date so that he could obtain additional discovery in preparation for trial.  The court denied the request and reiterated that trial would start the next day.  Given this clear and convincing record, it was objectively unreasonable to find that Peck did not request a trial continuance.  Because the NSC's determination that Peck failed to overcome the procedural bar is based on an

---

[285] ECF No. 115-20 at 6–7.

[286] *See* Nev. Rev. Stat. § 34.810(1)(b)(2).

[287] 28 U.S.C. § 2254(d)(2); 2254(e)(1).

1    unreasonable determination of fact, the NSC's cause-and-prejudice determination is not entitled

2    to deference.[288]

3          Applying de novo review and assuming arguendo that Peck could establish cause for

4    failing to raise the claim on direct appeal, he fails to establish prejudice. Peck has not shown that

5    the failure to grant a trial continuance so he could obtain additional DNA discovery worked to

6    his actual and substantial disadvantage.[289] Peck had two and a half years to prepare his defense

7    and research his DNA issues at the prison where he admitted that he had access to legal-research

8    resources. He also had at least three pretrial attorneys, including McKenna (who reportedly told

9    Judge Adams that he favored further DNA tests), the WCAPDO, and Lindsay. Lindsay requested

10   funds and hired a DNA expert who was slated to review the State's DNA evidence. Peck

11   subpoenaed other witnesses for his defense case, but the defense's DNA expert was not called as

12   a witness at trial. Peck has not demonstrated that, given more time, he would have been granted

13   additional funds to hire a second expert or that he had the means to do so himself given that he

14   was indigent and previously represented by appointed counsel.

15

16

17

---

18   [288] Peck argues that, due to the NSC's unreasonable determination of fact, I may excuse his
     procedural default outright and apply de novo review to the substantive claim in Ground 3. ECF
19   No. 141 at 25. The cases he relies upon do not support his position. For example, in *Sivak v.
     Hardison*, 658 F.3d 898, 907 (9th Cir. 2011), the state court unreasonably determined that a
20   *Napue* claim was not raised in the state proceedings even though the record demonstrated it had
     been raised, addressed on the merits, and denied. *Id.* In Peck's case, the procedural bar was
21   applied because Peck did not raise the claim on direct appeal and the record confirms that fact.
     As the Court in *Sivak* stated, "[t]he procedural default doctrine self-evidently is limited to cases
22   in which a 'default' actually occurred *i.e.,* cases in which the prisoner actually violated the
     applicable state procedural rule." The other cases that Peck relies upon similarly fail to support
23   his position.

     [289] *Shinn*, 596 U.S. at 379–80.

1    Peck's offer of proof in DNA expert Mehul B. Anjaria's submission of observations and

2 opinions[290] fails to establish prejudice to overcome default. Anjaria's submission states that it is

3 not a formal report; merely a list of observations.[291] Anjaria indicated that the WCCL had a

4 reference standard for Peck from another case in 1997[292] but Anjaria disputed the possibility that

5 the WCCL contaminated Inman's sample with Peck's 1997 sample because it was not possible to

6 create sperm cells by planting blood cells, and such contamination would have been evident: Had

7 the WCCL done that, then DNA from the victim in the other case would have transferred to the

8 evidence in Inman's case.[293] Anjaria did not see foul play and said that they could look for other

9 things, "but we'd just be fishing," as the chain of custody revealed nothing that would have risen

10 to the level needed to prove Peck's innocence.[294] So Anjaria's conclusions do not support Peck's

11 argument that he would have found an expert to dispute the State's DNA evidence had he been

12 given a continuance.

13    Given the overwhelming evidence at trial attesting to the chain of custody for the DNA

14 samples from Inman and Peck, Peck fails to establish that he was actually and substantially

15 prejudiced by the denials of his requests for a trial continuance. The mere possibility that a

16

17 ─────────────────────

[290] ECF No. 109-30. Peck diligently developed Anjaria's expert opinions during his state
18 postconviction proceeding. However, the state district court did not admit the documents of
Anjaria's observations as evidence during the postconviction review hearing, ECF Nos. 109-30;
19 114-14 at 4, 22–25, presumably because it did not reach of the merits of Peck's claim due to the
state procedural bar. I am able to consider Anjaria's observations and the corresponding
20 information about his conclusions as an offer of proof as Peck developed it during the state
postconviction proceedings. *See Shinn*, 596 U.S. at 382, 385, 389; *Williams*, 529 U.S. at 439–40;
21 *Holland v. Jackson*, 542 U.S. 649, 653 (2004).

[291] ECF No. 109-32 at 41.
22
[292] *Id.*
23
[293] *Id.*

[294] *Id.*

continuance of trial might have afforded Peck an opportunity to speculate that the DNA evidence might have suffered defects is insufficient to establish actual and substantial prejudice necessary to overcome procedural default.[295]

To the extent that it is ambiguous whether I may apply de novo review to the substantive claim raised by Ground 3, even if I were to apply de novo review, no relief is warranted because Peck fails to establish that the denial of trial continuance rendered his trial fundamentally unfair.[296]  Peck had access to library materials at the prison for more than two years before trial. Before and during trial, he continued to benefit from Lindsey's assistance with his case and had access to most of his legal materials.  Peck has not demonstrated that, under these circumstances, the failure to grant a request for a trial continuance was fundamentally and constitutionally unfair.  So I find that Peck is not entitled to federal habeas relief on Ground 3.

**D.    Ground 4—Unduly suggestive voice-identification evidence**

Peck alleges that his right to due process was violated by the admission of unduly suggestive voice-identification evidence.[297]

### 1.    Additional Background

Inman testified at Peck's trial that she was subpoenaed to attend a motion hearing two weeks before trial but the prosecutor did not ask her to attend for the purpose of identifying

---

[295] *Shinn*, 596 U.S. at 379–80; *Carrier*, 477 U.S. at 494.

[296] *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (stating that "[c]ourts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review").

[297] ECF No. 97 at 24–26.

Peck's voice.[298]  The hearing lasted "five, ten minutes."[299]  She adequately heard Peck speak and heard him say more than simply "yes, sir; no, sir."[300]  When she heard Peck's "distinct" "child-like voice," she told the victim assistant that "his eyes look familiar," and he "sounded familiar."[301]  She concluded, "It's him," based on recognizing his voice, and looking at him and the composite sketch drawn after the rape.[302]  Inman admitted that she was aware Peck was indicted and the State believed he was the assailant.[303]  But she said that no one told her to pay attention to Peck's voice and no one expected or required her to identify him in court.[304]  The State had Peck stand at trial, and Inman said that his height was consistent but her assailant was thinner than Peck appeared at trial.[305]

Lindsay's motion to strike Inman's voice-identification as unduly suggestive was denied:

> [DEFENSE COUNSEL]: Your Honor, I would move to strike the testimony regarding his voice.  I believe it's absolutely unduly suggestive.  I believe it was done with her knowledge, as she's testified to, that he had been indicted, that he was the man the State was seeking to prosecute.  And I believe they brought a very, very I mean, it is—it's one thing to stop in court and say stand up and rise.  It's even another thing to stand up in court, but they—went out of their way to give the most suggestive possible identification, and I believe it should be suppressed and I believe the statements should be—the statements regarding his voice, I believe that those should be, in fact, stricken, and I believe the jury should be instructed to disregard them.  Thank you, your Honor.

---

[298] ECF No. 107-20 at 70–71, 74.

[299] *Id.* at 71–72.

[300] *Id.* at 74.

[301] *Id.* at 70–74.

[302] *Id.* at 74–75.

[303] *Id.* at 76–80.

[304] *Id.* at 83–84.

[305] *Id.* at 85.

1    THE COURT:  Thank you.  The motion is denied.[306]
     . . . .

2    THE COURT: [I]'d also like to make just a brief record
     concerning Mr. Lindsay's earlier motion regarding Ms. Inman's
3    testimony of her identification of the defendant.  There are two
     considerations the Court has.  First of all is whether or not the
4    circumstances are so unduly suggestive as to lead to substantial
     likelihood of irreparable misidentification.  I don't find that's the
5    case here.  Ms. Inman was brought to the court.  She knew that the
     defendant would be present.  I don't know whether or not she
6    knew the defendant would speak.  Ordinarily defendants in pretrial
     proceedings don't speak or speak very little, but in any event, at
7    the proceeding she attended that Mr. Peck did speak to some extent
     in addressing the Court, she was not asked to identify him.  She
8    was not asked to pay attention to his movements, or his voice or
     any other aspect of his conduct.  And I find her testimony is
9    credible when she testified that in the court she noticed this
     defendant's voice as striking.  And it moved her to conclude that
10   the defendant was the perpetrator of this offense.

11   I've also considered this between the NRS 48.035 and balanced its
     probative value versus unfair prejudice of the defendant and the
12   other considerations in that statute.  And I find that the probative
     value is not substantially outweighed by those considerations and,
13   therefore, the testimony should have been and was admitted.[307]

14       **2.    *Standards for evaluating suggestive identification***

15       To be "impermissibly suggestive," an identification procedure must "give rise to a very

16   substantial likelihood of irreparable misidentification."[308]  When an unnecessarily suggestive

17   procedure is used, "suppression of the resulting identification is not the inevitable

18   consequence."[309]  Instead, "the Due Process Clause requires courts to assess, on a case-by-case

19   _____

20   [306] *Id.* at 87–88.

     [307] *Id.* at 169–70.

21   [308] *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also, e.g.*, *United States v. Pheaster*,
     544 F.2d 353, 369 (9th Cir. 1976) (finding that due-process protections that apply to photograph
22   or line up identifications likewise apply to voice identifications because the possibility of
     "irreparable misidentification" is as great).

23   [309] *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (first citing *Manson v. Brathwaite*, 432
     U.S. 98, 112–13 (1977), then citing *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972)).

basis, whether improper police conduct created a 'substantial likelihood of misidentification.'"[310] "'[R]eliability [of the eyewitness identification] is the linchpin' of that evaluation."[311] The factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.[312]

The "central question" for admissibility is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive."[313] When "the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed."[314] "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury."[315] The Supreme Court has explained that under its precedent, when no improper law-enforcement activity is involved, "it suffices to test reliability through the rights and opportunities generally designed for that purpose," i.e., vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.[316]

---

[310] *Id.* (quoting *Neil*, 409 U.S. at 201).

[311] *Id.* (quoting *Manson*, 432 U.S. at 114) (alterations in original).

[312] *Neil*, 409 U.S. at 199–200.

[313] *Id.*

[314] *Perry*, 565 U.S. at 239 (internal quotation marks omitted) (citing *Manson*, 432 U.S. at 114, 116).

[315] *Id.* (footnote omitted).

[316] *See id.* at 233.

1

2

       ***3.***      ***Even if it was error to introduce evidence of Inman's voice identification, that error was harmless.***

3           On direct appeal the NSC determined that, even assuming the admission of the voice

4  identification evidence was error, it was not prejudicial considering the evidence of Peck's guilt:

5                       [P]eck asserts that the victim's pretrial voice identification of him
                       was unduly suggestive because the State requested her attendance

6                       at a pretrial hearing where she heard Peck speak and then testified
                       at trial that she recognized his voice, despite the 15 years that had

7                       elapsed since the offense.  Even assuming error, *see generally*
                       *Wright v. State*, 106 Nev. 647, 650, 799 P.2d 548, 550 (1990)

8                       (providing that exclusion of pretrial identification evidence (police
                       lineup) is warranted if procedures are unnecessarily suggestive

9                       such that identification is unreliable), we discern no prejudice
                       considering the evidence establishing Peck's guilt.[317]

10

11           Non-structural trial error of a constitutional dimension raised on direct appeal is subject

12  to the "harmless beyond a reasonable doubt" prejudice standard enunciated in *Chapman v.*

13  *California*.[318]  When there is a trial error of constitutional dimension and AEDPA governs, it is a

14  precondition to federal relief that a federal habeas court find that the state court's decision

15  applied *Chapman* in an objectively unreasonable manner.[319]

16           I conclude the NSC's application of *Chapman* and determination that any error in

17  admitting the voice-identification evidence was harmless beyond a reasonable doubt is neither

18  contrary to, nor constitutes an unreasonable application of, clearly established federal law and is

19  not based on an unreasonable determination of fact considering the evidence presented in the

20

---

21  [317] ECF No. 108-50 at 5.

    [318] *Chapman v. California*, 386 U.S. 18, 24 (1967).

22  [319] *See Davis v. Ayala*, 576 U.S. 257, 267–70 (2015); *see also Brown v. Davenport*, 596 U.S.

23  118, 122 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in [*Brecht v. Abrahamson*, 507 U.S. 619 (1993)] and the one Congress prescribed in AEDPA.").

1    state-court proceeding.  Even if the voice-identification evidence was unduly suggestive, its

2    admission was harmless beyond a reasonable doubt considering the strength of the DNA

3    evidence identifying Peck as the assailant.  Peck is not entitled to relief on Ground 4.

4    **E.    Ground 6—Knowing use of false evidence**

5            Peck alleges that the State's knowing use of false evidence to convict him violated his

6    right to due process.  He claims that the State's criminalist testified falsely when he agreed with

7    the prosecutor that duplicating DNA through the PCR technique is "almost like growing the

8    DNA."  Peck claims that the jury was misled because the PCR technique uses synthetic replicas

9    of DNA, not replicas of natural DNA, and he was therefore convicted on false evidence.[320]

10   Respondents contend that this claim is procedurally defaulted and the testimony was not false.[321]

11           *1.      Additional background*

12           At trial, WCCL senior criminalist Riolo testified using a PowerPoint presentation[322] and

13   gave a detailed explanation of DNA testing and PCR.[323]  He explained that, when the amount of

14   DNA is small, they "make copies of the DNA," and "do this through a technique called PCR."[324]

15   He explained, "What PCR is, is we take our DNA and we make copies of the DNA.  We start out

16   with one piece, and we put it through one cycle.  The next cycle we end up with more copies,

17   double; and third cycle, more; next cycle, more, and more.  We do this for 28 cycles."[325]  "So

18

19

---

20   [320] ECF No. 97 at 29–31.

21   [321] ECF No. 135 at 14–15.

22   [322] It appears that the PowerPoint presentation was not admitted into evidence at trial.

     [323] ECF No. 107-25 at 8–21.

23   [324] *Id.* at 9, 14–15.

     [325] *Id.*

from one piece of DNA, we exponentially have increased the amount of samples."[326]  He

explained that "[o]nce we have the amplified DNA we . . . take a portion of the sample and put

some chemicals into this" and put it into an electropherogram that detects the DNA profile.[327]

He explained that they compare the DNA profile generated by the electropherogram with the

DNA profile of a known reference standard to determine whether the profiles match.[328]  He

testified that the process and procedures he described are generally recognized throughout the

scientific community as reliable.[329]

The State prosecutor elicited Riolo's agreement that PCR does not change the DNA

profile, and duplicating the DNA profile is "almost like growing the DNA":

> A:    We've progressed to better technology.  If I could give an
> example, in the RFLP technology, for us to get a DNA
> profile we'd need a stain the size of like a dime. Now,
> basically, we can get DNA from a plucked hair, which is a
> lot smaller.
>
> Q:    And would that be the PCR application that you've just
> described here?
>
> A:    That's correct.
>
> Q:    The ability to do that is what allows you to get a smaller
> sample and get a DNA profile out of it?
>
> A:    Yes.
>
> Q:    And I think you said it's by repeating or duplicating, almost
> like growing the DNA; is that a fair statement?
>
> A:    Sure.

---

[326] Id.

[327] Id.

[328] Id. at 17, 36.

[329] Id. at 25.

Q:      Okay. But you're not changing the DNA profile, is that how I understand it?

A:      That is correct, yes.

Q:      So you're taking the DNA profile and making it— duplicating it enough times, repeating it enough times to get a big enough sample to do a DNA test?

A:      That's correct.[330]

Riolo testified that Peck's DNA sample was received in the lab in March 2002.[331]  During cross examination, Peck stated that he understood unrelated individuals had been found to have identical DNA, but Romero responded that she was not aware of that.[332]  Peck called Romero and examined her in his case-in-chief, and asked her whether she was familiar with a May 2004 article in the Journal of Forensic Science, but she did not know whether she had read it.[333]

During deliberations, the jury sent two notes concerning the DNA evidence and argument.  First, the jury asked for "the article regarding DNA from Forensic Journal about 2 individuals have the same DNA."[334]  With Peck's consent, the trial court responded to the note, "Please rely on your recollection of the evidence at trial."[335]  The second note had two questions: (1) We want to see the envelopes to show the chain of custody; and (2) We want to see the DNA test result graphs.[336]  The trial court gave the same response as to the first note.[337]

---

[330] *Id.* at 22–23.

[331] ECF No. 107-25 at 27.

[332] ECF No. 107-26 at 65.

[333] ECF No. 142-2 at 57–58.

[334] ECF No. 107-28 at 2.

[335] *Id.* at 3.

[336] ECF No. 107-29 at 2.

[337] *Id.* at 3.

55

1

## 2. Standards for evaluating presentation of false evidence

2      "[A] conviction obtained through use of false evidence, known to be such by

3  representatives of the State, must fall under the Fourteenth Amendment."[338]  "The same result

4  obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it

5  appears."[339]  "A new trial is required if 'the false testimony could . . . in any reasonable

6  likelihood have affected the judgment of the jury.'"[340]  For example, in *Miller v. Pate*, the

7  prosecution presented expert testimony that reddish-brown stains found on the defendant's shorts

8  were blood.[341]  It was later established that the prosecution knew at the time of trial that the

9  stains were paint.[342]  The Court reversed the conviction and reaffirmed its earlier holding that

10  "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing

11  use of false evidence."[343]

12

## 3. Peck does not show that the State's characterization of the DNA evidence was false, so he is not entitled to habeas relief.

13

14      In Peck's state postconviction proceedings, the NSC rejected this claim as procedurally

15  defaulted and found that Peck failed to justify excusing the procedural bar as challenges to the

16  reliability of DNA evidence and related testimony should be raised during cross-examination of

17  the witnesses or by defense experts and Peck cannot assert his own representation was

18  ineffective:

19

20  [338] *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).

    [339] *Id.*

21  [340] *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271).

22  [341] *Miller v. Pate*, 386 U.S. 1, 3–4 (1967).

    [342] *Id.* at 5–6.

23  [343] *Id.* at 7 (citing *Mooney v. Holohan*, 294 U.S. 103 (1935); *Napue*, 360 U.S. 264; and *Pyle v. State of Kansas*, 317 U.S. 213 (1942)).

1

2

3

4

5

6

7

> [P]eck raises several claims that could have been raised on direct appeal and are thus procedurally barred absent a showing of good cause and prejudice, which he has not made.  *See* NRS 34.810(1)(b)(2); NRS 34.810(3).  Specifically, Peck argues . . . that the inculpatory DNA evidence presented at trial was unreliable and false, that the forensic scientists discussing it committed perjury, that the scientists gave "flawed" testimony because the scientific foundation was suspect, and that the State committed misconduct in eliciting perjury.  Peck has failed to justify excusing the procedural bar because challenges to the reliability of the DNA evidence and related testimony should have been raised by Peck in cross-examining those witnesses or by defense experts, and he cannot assert that his own representation was ineffective.[344]

8  The NSC's determination the claim is procedurally defaulted because Peck failed to raise it on

9  direct appeal is objectively reasonable.[345]  Peck did not raise the claim on direct appeal and fails

10  to establish cause and prejudice to overcome the procedural default.

11        Even if I were to apply de novo review,[346] no relief is warranted.[347]  Peck has not

12  established that the synthetic nature of the DNA profile generated from the PCR process is

13  unreliable.  Riolo testified that the PCR process had been accepted as reliable throughout the

14  scientific community.  And even if I assume that Riolo's testimony concerning when Peck's

15  DNA arrived at the lab was false, Peck has not established a nonspeculative basis to conclude

16  that such false testimony caused prejudice.  Fassett locked Inman's 1994 samples into the

17  evidence vault in 1994.  Romero testified that they were not checked out until she retrieved them

18  in 2002.  Nothing establishes that Peck's 1997 DNA sample was open in the lab at the same time

19  as Inman's earlier 1994 sample.  Peck fails to establish any basis, beyond speculation, to

20

21

---

22  [344] ECF No. 115-20 at 6.

[345] *See* Nev. Rev. Stat. § 34.810(1)(b)(2).

23  [346] *See Berghuis*, 560 U.S. at 390.

[347] *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).

1  conclude that false testimony could in any reasonable likelihood have affected the judgment of

2  the jury.  I thus find that Peck is not entitled to relief on Ground 6.

3  **F.      A certificate of appealability is denied.**

4       The right to appeal from the district court's denial of a federal habeas petition requires a

5  certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial

6  showing of the denial of a constitutional right."[348]  When "a district court has rejected the

7  constitutional claims on the merits," that showing "is straightforward: The petitioner must

8  demonstrate that reasonable jurists would find the district court's assessment of the constitutional

9  claims debatable or wrong."[349]  For procedural rulings, a certificate of appealability will issue

10  only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial

11  of a constitutional right and (2) whether the court's procedural ruling was correct.[350]  Applying

12  these standards, I decline to issue a certificate of appealability.

13                                    **Conclusion**

14  **IT IS THEREFORE ORDERED** that:

15       1.  Petitioner Frank M. Peck's third amended petition [ECF No. 29] is **DENIED**.

16       2.  A certificate of appealability is **DENIED**.

17       3.  All requests for an evidentiary hearing are **DENIED**.

18       4.  Petitioner Frank M. Peck's motion to renew petition [ECF No. 158] is **DENIED** as moot.

19       5.  The Clerk of Court is directed to:

20            a.  **SUBSTITUTE** Terry Royal for respondent Brian Williams;

21

22  _____
[348] 28 U.S.C. § 2253(c).

23  [349] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

[350] *Id.* at 484; *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

b. **SERVE** a copy of this order on the Ninth Circuit Court of Appeals in its Case No. 25-110 **by June 4, 2025**;

c. **ENTER JUDGMENT** accordingly; and

d. **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
June 3, 2025